**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 10 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BRENDA MESSER,

      Plaintiff-Appellant,

v.

AMWAY CORPORATION,

      Defendant-Appellee.

No. 02-3268
(District of Kansas)
(D.C. No. 01-CV-2264-KHV)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HOLLOWAY,** and **McCONNELL**, Circuit Judges.

## I.    INTRODUCTION

Appellant Brenda Messer suffered third-degree burns after using a floor-stripping product she alleges was manufactured by appellee Amway Corporation ("Amway").  The complaint Messer filed against Amway asserted claims for: (1) strict liability and negligent failure to warn; (2) strict liability and negligent design;  (3) negligent distribution; (4) negligent inspection; (5) negligent testing;

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

and (6) punitive damages. Amway moved for summary judgment on all claims. The district court granted Amway's motion on several of Messer's claims and ordered Messer to show cause in writing as to why the court should not direct the entry of judgment in favor of Amway on her remaining claims and as to why her expert's testimony should not be excluded. Messer filed a response to the Order to Show Cause and the district court heard argument on the matter. Thereafter, the court issued a final order excluding the expert's proffered testimony and disposing of all Messer's claims in favor of Amway. Messer then filed this appeal challenging the grant of summary judgment in favor of Amway.[1] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the grant of summary judgment. Amway's motion to file a surreply brief is **denied**.

## II.    FACTUAL BACKGROUND

On March 22, 1997, Lisa White, the manager of Salon Kalibre in Oletha, Kansas, purchased a 2.5 gallon container of Power Off Heavy Duty Stripper Concentrate ("Power Off Concentrate" or the "Product") from Gwen Farrell. Farrell obtained the Product from an Amway distributor known as Mitchell & Associates/EDI ("EDI"), who purchased it directly from Amway. On March 23, 1997, White, Messer, and Messer's son, Jeremy Graves, met at Salon Kalibre.

---

[1]Messer does not appeal from that portion of the district court's order excluding the proffered testimony of her experts.

White testified in her deposition that she removed the Power Off Concentrate from the box and read the label. She then opened all the doors of the salon and turned on the vent fan because the label warned that the Product should be used in a well-ventilated area. White further testified that the label contained no information on the necessity of using any equipment to apply the Product although it may have indicated that the user should wear rubber gloves because the Product could cause "minor skin irritation."

White also testified that the label instructed that the Product should be diluted "five to one" which White understood to mean that she should "use five parts water, one part Power Off Concentrate in a bucket." She then stated that she diluted the Product by putting three gallons of water in a bucket and adding one cup of Power Off Concentrate. Amway questioned White extensively on this issue:

> Q: And how many gallons did you have in the bucket?
> A: Three.
> Q: Three gallons of water?
> A: Yes.
> Q: And how much chemical did you put into that bucket of water?
> A: A cup.
> Q: A cup?
> A: Eight ounces.
> Q: And when you poured it in there–let me back up. Did you ever pour the chemical directly onto the floor without having first poured it into the bucket to mix it up with the three gallons of water?
> A: I don't think so, no. Not that I recall, no.

Although White testified that she did not mix the Product by pouring it directly onto the floor, Graves testified as follows:

> Q: And do you recall, was [White] pouring the product on the floor and then adding water onto the floor or what do you recall in that regard?
> A: I think that's how it went.
> Q: So she would take the bottle–the container and pour the product from the container, from this large two-and-a-half gallon container, pour it onto the floor in an area and then pour water on it?
> A: Yes, mixed a lot of water.
> Q: Did you ever see Lisa White at any time ever pour the product from the two-and-a-half gallon container into a large bucket and mix it with water; did you ever see that?
> A: I think that's how we started it out.
> Q: You say that's how it started out?
> A: I think so.
> Q: Did it change at some point as you were doing the floor to the point where she would just be pouring the product from the container, from the two-and-a-half gallon container directly onto the floor and then adding the water?
> A: What do you mean?
> Q: Well, at some point in time in the process of cleaning the floor, did you see occasions where Lisa White would simply pour the product from the large two-and-one-half gallon container directly onto the floor and then add water to the area where she had just poured the product directly from the container?
> A: Yes.

Messer testified that when she arrived at Salon Kalibre, White and Graves were already there and working on the floor. She further testified that she did not recall seeing the container of Power Off Concentrate until White mixed more. She did not, however, watch White mix additional batches except "out of the

-4-

corner of [her] eye" and never mixed any herself. Messer also testified that she did not read the label on the Product before she began working on the floor.

Messer began scrubbing the salon floor using the mixture prepared by White. She testified that she was clothed in long pants, a long-sleeved shirt, shoes, and socks and was wearing rubber gloves. She worked for over one hour, kneeling in the solution and scouring the floor with a brush. Messer testified that her clothing got wet and was pressing against her skin. She did not, however, feel any discomfort. When Messer returned to her home and removed her pants, she noticed that the skin on her knees was dark. When she began to wash her skin with soap and water, she experienced a burning sensation. Messer testified that White drove her back to the salon and White's husband cut the label off the Power Off Concentrate container. Messer testified that she brought the label with her to the emergency room and either she or White gave it to a nurse.

Messer was diagnosed with third-degree skin burns to both knees and her medical treatment ultimately included skin grafts. She thereafter filed a products liability action against Amway raising the following theories: (1) strict liability and negligent failure to warn; (2) strict liability and negligent design; (3) negligent distribution; (4) negligent inspection; (5) negligent testing; and (6) punitive damages. Amway moved for summary judgment and the district court sustained the motion as to all of Messer's claims. This appeal followed.

## III.    DISCUSSION

### A.    Standard of Review

This court reviews a grant of summary judgment de novo, applying the same standard as the district court. *Welding v. Bios Corp.*, 353 F.3d 1214, 1217 (10th Cir. 2004). A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When determining whether a genuine issue of material fact exists, all "justifiable inferences" are drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate, however, if the party opposing the motion "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

### B.    Strict Liability and Negligent Design Claims

Messer's strict liability and negligent design claims are governed by the Kansas Product Liability Act, Kan. Stat. Ann. §§ 60-3301 to -3307. Messer asserts, *inter alia*, that the Product has a design defect. *See Jenkins v. Amchem Prods. Inc.*, 886 P.2d 869, 886 (Kan. 1994) (identifying three types of product defects: manufacturing defects, warning defects, and design defects). "Kansas

substantive law provides that every products liability action must be based on a defective condition in the product, regardless of the theory of recovery." *Meyerhoff v. Michelin Tire Corp.*, 70 F.3d 1175, 1181 (10th Cir. 1995); *see also Jenkins*, 886 P.2d at 886 ("a product [must] be both defective *and* unreasonably dangerous"). Thus, to prevail on her design defect claims Messer must establish the existence of a specific product defect; general assertions that the Product is defective or the "mere fact of an injury" are insufficient. *Jenkins*, 886 P.2d at 889-90.

Messer identified the alleged defect in the Product as "its level of corrosiveness." *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1233, 1236 (D. Kan 2002). In addressing her design defect claim, the district court first concluded that the undisputed evidence showed that the Product was diluted at a ratio of 1 part Product to 48 parts water. *Id.* at 1240. Although Messer argues that the district court's conclusion is erroneous because the level of dilution is a disputed material fact, her argument lacks merit.

Admittedly, the evidence in the record is contradictory. White testified at her deposition that she diluted the Product by pouring eight ounces of Product into a bucket containing three gallons of water. Although she further testified that she never poured the Product directly onto the floor without first mixing it in the bucket, the record contains a statement given by White to Amway which

contradicts that testimony. In that statement, White asserted that she did not use a bucket, but poured a cup of Power Off Concentrate directly onto the floor and then poured approximately three gallons of water on top of the Power Off Concentrate. Further, Graves testified at his deposition that White mixed the Product by pouring it directly from the container onto the floor and then pouring water on top of it. Messer argues that this evidence, together with the report of Amway's expert toxicologist who opined that Messer's injuries were "more consistent with a sustained exposure to undiluted [Power Off] concentrate," could lead a reasonable jury to conclude that she was exposed to several different concentrations of the Product.

As required at the summary judgment phase, the district court viewed the evidence before it in the light most favorable to Messer. *Rice v. Office of Servicemembers' Group Life Ins.*, 260 F.3d 1240, 1249 (10th Cir. 2001). Applying this standard, the flaw in Messer's argument becomes apparent. White testified that she read the label on the Product before she, Graves, and Messer used it on the floor. She further testified that she understood the label she read to require dilution of "five parts water, one part Power Off in a bucket."[2] Messer testified that she did not read the label until after her exposure and injury. If Messer was

---

[2]The label produced by Amway states, "1. Use a 1:5 dilution (26 oz. Power Off Heavy-Duty Stripper Concentrate to 1 gallon hot water). 2. Spread evenly on floor with a mop or applicator . . . ."

exposed to under-diluted Power Off Concentrate because she and White failed to heed the instructions requiring them to dilute the Product 1:5 before spreading it onto the floor, Messer may not recover on a design defect theory. *Siruta v. Hesston Corp.*, 659 P.2d 799, 822 (Kan. 1983) ("[A] manufacturer's design and warning obligations extend to the plaintiff's foreseeable, but not to his unforeseeable, misuse of the product. The failure to follow proper instructions and directions provided by the manufacturer may constitute *unforeseeable* misuse." (citations omitted)).[3] Accordingly, the district court properly analyzed the evidence supporting Messer's design defect claims by first assuming that she was exposed to Power Off Concentrate diluted at a ratio of 1:48.

After noting that Messer had failed to present any admissible expert testimony that the Product is corrosive to human skin at a concentration of 1:48, the district court dismissed her design defect claims. On appeal, Messer concedes she has no competent expert testimony but argues that she can prove the existence of a design defect without expert testimony. Specifically, Messer asserts that she is entitled to rely on circumstantial evidence to prove the existence of a design defect. *See Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 360 (Kan. 1983) (analyzing plaintiff's burden in a strict liability case and holding that manufacturing defects

---

[3]Messer does not argue that the failure to follow the label instructions regarding proper dilution of the Product is a foreseeable misuse. *See Siruta v. Hesston Corp.*, 659 P.2d 799, 822 (Kan. 1983).

may be proved "inferentially, by either direct or circumstantial evidence"); *see also Jenkins*, 886 P.2d at 889 ("It would appear that either a design defect or a manufacturing defect can be proven by circumstantial evidence."). Although Amway argues that circumstantial evidence alone is insufficient in *design defect* cases, it is unnecessary to address the issue because Messer has failed to introduce even circumstantial evidence of design defect.

The Supreme Court of Kansas has held that "[i]nferring a defect from the fact of the injury . . . is unsuitable." *Jenkins*, 886 P.2d at 889. Messer argues, however, that the following additional circumstantial evidence supports her position that the Product has a design defect: (1) there is a strong temporal relationship between her use of the Product and her injuries, (2) the area of her body that received the injuries is the area that was exposed to the Product, (3) common human experience tells that third degree chemical burns do not occur unless a person comes into contact with a chemical capable of causing such burns, and (4) her injuries were caused by exposure to an alkali and the Product contains two alkalis. While it may be appropriate to characterize these four assumed facts as circumstantial evidence that the Product *caused* Messer's injuries, they are not circumstantial evidence that the Product is *defective*. *See id.* ("Inferring a defect from the fact of the injury, particularly where, as here, the product was exactly what the defendants intended and plaintiff makes no argument that the product

-10-

could have been designed to more safely perform its intended function, is unsuitable."). Because Messer has presented no admissible evidence from which a reasonable jury could conclude that the Product's corrosiveness is a defect, her design defect claims were properly dismissed by the district court.

C.     *Strict Liability and Negligent Failure to Warn Claims*

Messer also asserted strict liability and negligent failure to warn claims against Amway. Under Kansas law, "[a] product, though perfectly designed and manufactured, may be defective if not accompanied by adequate warnings of its dangerous characteristics." *Meyerhoff*, 70 F.3d at 1181. Messer first argues that the label on the Power Off Concentrate container is defective. Even assuming that the label White and Messer saw on the container of Power Off Concentrate they used was defective, to prevail on her failure to warn claims Messer must also demonstrate that the defect was present when the label left Amway's control. *See Jenkins*, 886 P.2d at 886.

During discovery in this case, Amway produced evidence that the label used on containers of Power Off Concentrate manufactured during the time White purchased the Product was red, black, and white and contained, *inter alia*, the following instructions and warnings:

> **DIRECTIONS**: WEAR APPROPRIATE PERSONAL
> PROTECTION TO AVOID SKIN AND EYE CONTACT. . . .

> **DANGER**: CORROSIVE TO EYES AND SKIN. HARMFUL IF
> SWALLOWED. Contains sodium metasilicate and surfactants.
> Avoid contact with eyes, skin and mucous membranes. In case of
> contact, immediately flush with water for 15 minutes. Get prompt
> medical attention. If swallowed, do not induce vomiting. Give milk
> or water to drink and call a physician or poison control center
> immediately. Product also contains ethanolomine which upon
> inhalation overexposure may elicit respiratory irritation, kidney and
> liver damage. At recommended use dilution (1:5) product is a
> moderate eye irritant. **KEEP OUT OF REACH OF CHILDREN**.

*Messer*, 210 F. Supp. 2d at 1224. Messer, however, testified that the label she saw on the Power Off Concentrate container did not identify the Product's ingredients, did not warn users to wear appropriate personal protection, did not contain the word "danger," and only indicated that contact with the Product would "cause minor skin irritation." White testified that the label stated that the Product may cause minor skin irritation and that it instructed users to wear rubber gloves. She did not recall seeing the word "danger" on the label or any information warning users to wear appropriate personal protection.

Messer has not produced either the label she alleges she saw or the box in which the Product was packaged. Amway, however, asserts that it has produced copies or exemplars of every label it ever affixed to any and all 2.5 gallon containers of Power Off Heavy Duty Concentrate. None of these mirror the label White and Messer claim they saw on the container they used. In light of this evidence, the district court granted summary judgment in favor of Amway on the label failure to warn claims, concluding that Messer had cited "no evidence that

the Amway Power Off Concentrate label which she saw was one which Amway prepared or attached to Power Off Concentrate." *Id.* at 1228 (quotation omitted).

On appeal, Messer challenges the district court's conclusion by first arguing that a jury could conclude that the recollections of herself and White regarding the label they saw were not correct. Messer, however, cannot survive summary judgment on the hope that the jury will disbelieve her testimony or that of her witnesses. *See Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001).

Messer also argues that if the jury believes her testimony regarding the contents of the label she alleges she saw, it could conclude that the label affixed to the Product was placed there by Amway. In light of Messer's failure to produce the label and the uncontroverted evidence in the record that Amway has never produced a label like the one described by White and Messer, however, the testimony describing the label and White's testimony that she purchased the Product from an independent distributor of Amway products representative is insufficient to preclude the grant of summary judgment. The district court correctly concluded that Messer has not presented enough evidence from which a reasonable jury could conclude that the label described by Messer and White was on the Product in substantially that form when it left Amway's control. *See Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) ("In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation,

or on suspicion . . . . The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party.").  In other words, Messer's evidence does not "present[] a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.  Accordingly, Messer cannot satisfy all the elements of her label failure to warn claims and the court correctly granted summary judgment to Amway on those claims.[4]

Messer also argued that Amway is liable for negligent failure to warn, in that it failed to give EDI a Material Safety Data Sheet ("MSDS") and that it should have included a MSDS with each carton of Power Off Concentrate.  After Amway introduced uncontroverted evidence that it *did* supply EDI with a MSDS, the district court dismissed Messer's first claim.  Messer does not challenge that ruling on appeal.  The district court also dismissed Messer's second claim relating

---

[4]To the extent Messer also argues that the label Amway alleges it *did* place on the container of Power Off Heavy Duty Concentrate is also defective, her argument fails for a number of reasons.  First, although Messer identifies several alleged defects in that label, she has failed to present any evidence, either in the form of circumstantial evidence or expert testimony, to support those allegations. *Jenkins v. Amchem Prods., Inc.*, 886 P.2d 869, 889-90 (Kan. 1994).  (general allegations of defect are insufficient).  Further, she has failed to introduce any evidence from which a reasonable jury could conclude that the alleged defects caused her injuries. *See Wilcheck v. Doonan Truck & Equip., Inc.*, 552 P.2d 938, 942 (Kan. 1976) ("Regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a defect in the product caused the injury is a prerequisite to recovery.").

to the MSDS, concluding that Messer did not present any evidence that the failure to include a MSDS with each carton of Power Off Concentrate caused her injuries. Specifically, Messer failed to identify any information in the MSDS that was not on the label Messer and White claim to have seen on the Product and that would have prevented her injuries. *Messer*, 210 F. Supp. 2d at 1230. Further, Messer cited no evidence that either she or White would have read a MSDS or heeded any warnings contained in the MSDS. *Id*. Messer asserts that White's testimony that she read the Power Off Concentrate label before using the Product, is evidence that she would have read and heeded any warnings contained in the MSDS. Messer, however, has not directed this court to any admissible record evidence that supports this assertion. If anything, it is undermined by White's testimony that she does not always follow the directions on products.

Q. Do you follow directions?
A. Yes, pretty much.
Q. If a product says to wear rubber gloves, do you wear rubber gloves?
A. Not always.

Messer cannot create a genuine issue of material fact with "mere speculation, conjecture, or surmise" unsupported by any evidence. *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999). Accordingly, the district court properly dismissed Messer's MSDS failure to warn claims.

*D.      Negligent Testing and Negligent Inspection Claims*

Messer also alleged that Amway negligently failed to inspect and test the Product. The Kansas Supreme Court has held that,

> a manufacturer has a duty to make such tests and inspections, during and after the process of manufacture, as should be recognized as being reasonably necessary to secure the production of a safe product; and a manufacturer who negligently fails to use reasonable care in making such tests and inspections, and thereby produces a defective article which causes damage while being put to an ordinary anticipated use, is liable for such damage.

*Lindquist v. Ayerst Labs., Inc.*, 607 P.2d 1339, 1350 (Kan. 1980) (quotation omitted). The court further stated that a "plaintiff cannot succeed where [s]he fails to allege or prove that tests or inspections would have been effective." *Id.* (quotation omitted). As to the negligent testing claim,[5] the district court first stated, "the record shows that Amway conducted toxicological tests on Power Off Concentrate" and then concluded that Messer failed to introduce any evidence that Amway's testing was insufficient and failed to "suggest[] other tests that would have been more appropriate." *Messer*, 210 F. Supp. 2d at 1235. On appeal Messer only argues that the district court erroneously found that Amway had conducted tests on the Product. Even assuming that Amway did not conduct any

----

[5]Messer's appellate brief contains no argument relating to the district court's dismissal of her negligent inspection claim. Accordingly, she has waived her right to appeal that dismissal. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

-16-

tests on Power Off Concentrate, Messer has failed to indicate what tests should have been performed or how any such testing would have prevented her injuries. *See Lindquist*, 607 P.2d at 1350. Accordingly, the district court properly dismissed her negligent failure to test claim.

E.    *Negligent Distribution Claims*

Messer also argued, *inter alia*, that Amway negligently sold Power Off Concentrate in the undiluted form. *Messer*, 210 F. Supp. 2d at 1231. The district court concluded that Messer's claim failed because her theory of the case was premised on her argument that the Product is unreasonably dangerous when over-diluted at a ratio of 1:48. *Id.* at 1232. Thus, the fact that Amway sold the Product to White in concentrated form was irrelevant because Messer had no claim that she was injured by the concentrated Product. *Id.* Although Messer argues that a reasonable jury could conclude that she was exposed to under-diluted Power Off Concentrate, and thus also conclude that there was an unreasonable risk that users would under-dilute the concentrated Product, we have already rejected this argument. *See supra* § III.B. Messer's negligent distribution claim cannot survive summary judgment based on her argument that the jury could disbelieve White's testimony that she used a bucket to over-dilute the Power Off Concentrate 1:48 before applying it to the floor. Accordingly, the

district court properly concluded there is no merit to Messer's claim that Amway negligently distributed the Product by making it available in a concentrated form.

Messer also argues that Amway negligently allowed its distributors to sell Power Off Concentrate to non-professional users. The label which Amway alleges it affixes to containers of Power Off Concentrate states, "FOR COMMERCIAL USE ONLY–NOT FOR HOUSEHOLD USE." Messer asserts that "commercial use" means use by a professional floor-stripper or janitor and that she and White were, therefore, not commercial users. Messer then argues that Power Off Concentrate should not have been distributed to non-professional users who cannot safely use the Product in concentrated form because of their lack of skill and training. The district court dismissed this claim, concluding that Messer had no evidence that her injuries were caused by the failure of Amway or its distributors to ensure that the Product was sold only to professional users. *Messer*, 210 F. Supp. 2d at 1232. On appeal, Messer challenges the district court's statement that, "[t]he record contains no evidence with regard to what constitutes a 'professional' floor-stripper, whether Lisa White qualified as a professional floor-stripper, how professional floor-strippers perform their jobs or handle their floor-stripping products, or whether they would have handled the Power Off Concentrate in any way different from how Lisa White handled it." *Id.*

Specifically, Messer argues that the deposition testimony of Tom Truszkowski, the manager of Household Products and Technical Regulatory Services for Amway, provides some evidence that commercial use constitutes use by a professional janitor or floor cleaning company and that she did not purchase the Product for commercial use because it is clear from the record that she and White were "not janitors or members of a professional floor cleaning company." Even assuming Messer is correct, which we will do only for purposes of resolving this claim, she still does not point to any evidence in the record indicating if or how commercial users, including janitors or professional floor-strippers, would have mixed or applied the Product differently. Thus, she still has no evidence from which a reasonable jury could conclude that her injuries could have been avoided if White had been a professional janitor or floor-stripper. Accordingly, regardless of whether commercial use necessarily entails use by a professional floor stripper or janitor, Messer's negligent distribution claim[6] fails and it was properly dismissed by the district court.

---

[6]Messer's opening brief contains no argument challenging the district court's dismissal of her related claims that Amway negligently distributed Power Off Concentrate by not training "its distributors about the difference between household and commercial cleaning products," not ensuring "that distributors were aware of the proper use for commercial products," and not ensuring "that distributors were aware of the existence of MSDS sheets and the requirement to provide MSDS sheets under OSHA." *Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1231 (D. Kan. 2002) (quotations omitted). These claims are therefore waived. *Mhoon*, 31 F.3d at 984 n.7.

*F.    Claim for Punitive Damages*

Messer based her claim for punitive damages on Amway's failure to revise the Power Off Concentrate label after it learned that a user had been injured while using the pre-diluted product, Power Off Floor Stripper.[7]  Amway was notified of this injury in February 1995 but it did not recommend further tests or changes to the Power Off Concentrate label in response.  *Messer*, 210 F. Supp. 2d at 1225. The district court dismissed this claim based, in part, on its conclusion that a reasonable jury could not find Amway's conduct in continuing to market Power Off Concentrate with its existing label to be willful, wanton, fraudulent, or malicious.

Under Kansas law, Messer is not entitled to punitive damages unless she first shows entitlement to actual damages.  *Morsey v. Chevron, USA, Inc.*, 94 F.3d 1470, 1477 (10th Cir. 1996); *Enlow v. Sears, Roebuck, & Co.*, 822 P.2d 617, 624 (Kan. 1991).  Because we have affirmed the dismissal of all claims for actual damages asserted by Messer, she cannot recover punitive damages against Amway.

---

[7]Messer does not challenge the dismissal of her punitive damages claim based on her assertion that Amway does not have a procedure for tracking and reacting to injury reports.  *Messer*, 210 F. Supp. 2d at 1237.  Accordingly, the claim is waived.  *Mhoon*, 31 F.3d at 984 n.7.

## III.  CONCLUSION

The order of the district court granting summary judgment in favor of Amway on all claims asserted by Messer is **affirmed**.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge